in number 19-10, United States v. Zhong. Ms. Shapiro. Thank you, your honors. Good morning and may it please the court. This is Alexandra Shapiro on behalf of Appellant Dan Zhong. To shore up the lack of any victim testimony in this case against Mr. Zhong, the government resorted to multiple forms of improper and unfairly and deprived Mr. Zhong of a fair trial. I'd like to focus on two in particular. First, the testimony of three alleged victim workers and one of their wives who, eight to nine years before the charged conduct, experienced violence and threats of violence by others at Relin. And second, the testimony of a forced labor prosecutor and former senior diplomat who described supposedly typical and effective features of forced labor schemes told the jury that Chinese construction businesses operating abroad were hotbeds of forced labor and expounded on irrelevant inflammatory subjects, including slavery and sharecropping in the United States and the Chinese government's human rights abuses, including as minority. Can I ask whether you participated in the trial? I ought to know that. No, I did not, your honor. Thank you. Thanks. The improper admission of this evidence individually and cumulatively warrants reversal. First, with respect to the uncharged crimes evidence, it's important to emphasize that this evidence was admitted on the false premise that these witnesses would testify to Mr. Zhong's personal involvement in the horrifying events they described that occurred nearly 10 years before the charged conduct. In connection with the motion practice, the government represented that these witnesses would testify to the defendant's efforts to force the victims to return to Relin custody. The government told the district court that one victim, Kevin Liu, would testify that the defendant located him at a boarding house in Queens and that the defendant persuaded him not to contact the police and warned him he would lose his security deposit and that Relin would seize his mother's houses in China if he did not return to custody. And there are numerous other representations along these lines in the record, which are summarized in footnote three of our brief and appendix 84. The district court admitted the crimes over the defendant's objection specifically based on these representations. The district court noted that defendant's actions, including the alleged kidnapping and abduction of victim laborers justified it. The district court cited the government's intention of proving that the defendant's coercive techniques and practices of the China Relin worker were the same as those he used as president of U.S. Relin during the charged conspiracy and perhaps most importantly found that the probative value of defendant's conduct, including the kidnapping and abduction of victim laborers as a China Relin employee is not outweighed by the danger of unfair prejudice. And that's all at appendix 99 to 100. The evidence that these witnesses provided, which really dominated the trial, was of a dry evidence based on the alleged economic coercion as to the charge in the case. And then the government, and just to highlight a couple of points, I mean, does it matter that Zhang was taking over the same business that committed the other ones in 2002? I mean, isn't it part of the story of his conduct to say that the company had done this before and so those practices informed the expectations of its employees and so on? Why isn't that relevant? Well, your honor, the reason it's not relevant in this particular case is that we're talking about evidence from eight years earlier. We're talking about evidence of acts of just a completely different order of magnitude. You know, the jury is being told about events that involved, you know, scooping people up off the streets of flushing into a van, threatening people to break their legs, slashing them with a tool and introducing pictures of a foreign scar a worker experienced and all of this. I mean, I understand that you'll dispute that there was such evidence, but I suppose you might acknowledge that if it could be shown that even eight years after the fact, Mr. Zhang had said to workers, remember what we did to people eight years ago and so you should stay in line, then it would become relevant. And so your argument depends on the absence of such evidence, right? Well, I would say the following, your honor, there is no such evidence and indeed I want to point to court, and we mentioned this briefly in the reply brief, but I think it's critical to emphasize that despite the fact that in this appellate brief the government no less than three times asserts that there was evidence that my client was involved in efforts to abduct Kang Kai, that in fact the appendix citations it points to show no such thing. And I think that it's critical that the evidence was eight years earlier. There's no evidence in the record whatsoever as to what if any role Mr. Zhang played in the company in the early 2000s other than that people had a vague sense that he was a the Curley case. The court has excluded some evidence similar to this type of thing, but the problem here is not only that the evidence, there wasn't a sufficient link to admit the evidence, but also and perhaps most importantly the unfair prejudice that Mr. Zhang suffered by the fact that this evidence dominated the trial and the government highlighted it from the very first words of its opening all throughout the trial and then the beginning of its summation, it was a theme in the summation, the opening summation, the rebuttal, and then if I may, I'd like to turn to the expert testimony because I think that if anything only compounded the who had very fancy credentials as a forced labor prosecutor and high-ranking government official, his testimony was inadmissible under Rule 702 and as well as 403 and this court has emphasized that 403 plays a unique role in the district court's gatekeeping function when it comes to expert eliciting this expert's views on so-called typical features of forced labor, effective features, his argument mirrored the argument the government was presenting to the jury in a similar fashion to what happened in Cruz and Castillo, the two cases we cite in our brief in which this court reversed convictions in which the trial was tainted by similar expert testimony. In addition, Mr. DeBaca went on at length about using the mantra of the U.S. government and its ranking of China as a tier three country with a huge problem of forced labor. He emphasized both the Chinese abuses but also that this claim that this kind of forced labor was typical in the U.S. We've allowed expert testimony to describe organized crime operations or sex trafficking rings or that kind of thing. Are you arguing that forced labor operation is just qualitatively different or that just this expert went over the line and crossed the line from what would be a proper subject of expert testimony? We are focused on the record in this case and the particular testimony given by this expert. With respect to the organized crime example, I think this is very different. The type of testimony this court has permitted in such cases are testimony about things like the lingo that organized crime members use and the hierarchy and structure of an organized crime organization. That wasn't the testimony here. This expert was not limited. In fact, he didn't actually have any expertise on China whatsoever to speak of. He wasn't talking about anything similar. What about the expert testimony about the contract? In your view, is there a categorical rule that he shouldn't be talking about specific items in evidence or that that testimony about the contract just crossed the line? Your Honor, I take two things. Number one, I think the point is that that testimony crossed the line. We're not talking about testimony that simply tried to explain the terms, terms that would have been inaccessible to allay, but rather the use of opinions and adjectives like calling things red flags, saying they were troubling, that sort of thing. I think the more important point is that even if this court were to conclude that a couple of pieces of his testimony could have been admitted if the testimony had been limited to those pieces, we're talking about the overall inflammatory, highly prejudicial impact. I would urge the court, it's very difficult in a brief with fully the flavor of this testimony, but I would urge the panel to actually read the expert's testimony because when you read it in totality, what you see is the government asking these open-ended questions and the expert making long speeches where he veered, as I said, into these topics that are outrageously inflammatory and completely irrelevant. Can I ask you about another issue you didn't bring up? I'd like to get a brief comment on it. If you had been able to pursue the character testimony about Ken Wang's reputation for truthfulness, how much would it have added to what you already were able to do to impeach him? Well, I think that that was important and then what was perhaps even more important was that we earlier that he was not a credible witness. Well, was that really a judicial finding that he wasn't a credible witness? I mean, as I read the transcript from that proceeding, the judge just seems to be saying that she found his colleague to be more credible in describing his character than he himself was. That doesn't mean he's not a credible witness exactly, does it? It does, Your Honor. It wasn't about his character. There was a dispute about whether certain incidents occurred that related to his temper, I guess, which was relevant for the proceeding, which was about a gun permit, but the New Jersey judge... So it was about his character because it was about his temper, but you're saying since the basis of it was whether certain incidents happened, it was relevant to truthfulness. Well, the point is that he was right. And the judge said... Basically, it was a he said, she said, and the judge said he believed the other witness. And indeed, Judge Donnelly herself described the opinion that way. She said that the New Jersey judge didn't believe Wang. Okay. All right. You've reserved time for rebuttal, so we will hear from you again, but let's turn to counsel for the appellee, Mr. Solomon. Good morning, Your Honors. This is Alex Solomon. May it please the court. At trial, the government produced considerable evidence, both direct and indirect, connecting Dan Jeong to the pre-indictment conducted issue. This evidence established an overarching and continuous scheme to compel labor through the threat of force and serious harm. Conspirators used contractual coercive terms from the beginning back in 2000 through the indictment period, as well as the threats of force and intimidation to ensure that workers would to work against their will. And at bottom, a jury could reasonably conclude that the additional pre-indictment evidence was part of a larger scheme that spanned into the charging period, and that at all times, both pre-indictment and during the indictment period, the defendant, Dan Jeong, was a leader of this conspiracy. I think if we look at specifics, I would start with the comment that I think Your Honors noted upon, which was Dan Jeong's statement to PRC visiting dignitaries, that Ryland makes an example of escapees who were recaptured, so others will think twice before escaping. This comment was made in or around 2008 or 2009, shortly before the start of the indictment period, and the person who was made an example based on this description was in 2001 or 2002. Further, the renditions were coordinated and directed by people who reported directly to Dan Jeong, both Wenlong Dong and Ma Dongsheng. For example, there was a document found in Ma Dongsheng's office in a building that Dan Jeong also used. This is the 210 Pavonia building, and these documents tracked all escapees from 2001 into 2010. So documents about Sheng Liu and documents about Kai Kang are all there. But those people did not report to Dan Jeong when it happened. Dan Jeong was not in charge in 2001 to 2002, right? And you haven't charged a conspiracy. You haven't charged him for conduct occurring in 2001 and 2002. Sure. I guess a couple things, Your Honor. One is we couldn't charge him for 2001 and 2002 because he was an accredited diplomat until the end of 2009. Secondly, I think the evidence we introduced showed that at the time he was in charge of Ryland's U.S. operations, even though he did not become formally in charge of U.S. Ryland until 2010. He was in charge, and was that arguing to the jury that he was in charge of Ryland? Yes. So, for example, if you look at the transcript on page 1648, this is from Dan Jeong's own alien file. In a submission to the U.S. government, he claims that he was in charge of U.S. operations of Ryland as of December 2000. Additionally, we introduced evidence showing that he had control of the Ryland finances before the indictment period, and that if you look at the signature cards for, and this is in Government's Exhibit 516, the signature cards for access to the bank accounts, the corporate bank accounts, some of these appear to grant control over company accounts as early as 2000. Lastly, I would point your honors to... This is less than you had promised the district judge when you were introducing this evidence, right? Didn't you say that you were going to say that Jeong was personally involved in a lot of these acts such as kidnapping, and in fact, that Jeong himself had beaten up one of the workers, and it turned out when that person testified that it was not Jeong, but his brother that had beaten him up? That was the largest discrepancy, your honor, between what we promised and what we delivered. The witness had... You promised that he was actually going to be... You promised that he was actually going to be personally involved in the kidnappings and the beatings, but instead, what you delivered was what? That he had access to the finances and a management role at the time of the kidnappings and the beatings. Is that what you're saying? I guess one slight correction, your honor. We did not promise that he personally partook in the beatings. We just indicated that he actually... Not necessarily kidnappings, that he went and visited an escapee. This is Chuan Yang Sheng, who had escaped to a motel in Flushing. He personally visited him and said that... This is according to the witness statement before trial, that you better return to work or you have to acknowledge that the evidence about what happened in 2001 to 2002 about kidnappings and use of weapons and imprisonment of workers and these threats is a lot different than the conduct that you showed during the indictment period, which is really about employment contracts that are harsh and holding people's passports in crowded residences and so on. I mean, it is a different... It is conduct of a different character, right? I don't know that I would necessarily agree with that, your honor. At first, I would point your honor to the attempted abduction of Kai Kang. If you look at the transcripts on page 436, Wen Long Dong, who was Dan Zhang's direct report and engineers talked about efforts to locate Kai Kang and then on the transcript on pages 431, 432, the defendant, Dan Zhang, asked Ken Wang if he knew where Kai Kang was and this is all evidence that the same thing was going on that happened back in 2001, 2002. When a worker escapes, they make efforts to find him and just because the efforts were unsuccessful in 2010... I mean, asking somebody about where somebody is, is a lot different from establishing that there was an abduction and a beating, right? Sure, but if you look at the transcript on page 436, Wen Long Dong and engineers are talking about efforts to locate him and I don't think it would have been a logical leap for the jury to conclude that had they located Kai Kang, they would have forcibly returned him to Ryland custody. I think there were other specific pieces of evidence that were quite inflammatory during the indictment period. For example, there's the fact that Ryland kept workers in unsafe conditions, used double cylinder locks that the jury could have concluded they were used to prevent escape of workers from these housing facilities. There were many instances of work, both as personal servants of Dan Zhang and his family. They were used to build a Manhattan high rise that was going to have a penthouse for personal use by Dan Zhang's uncle. This was all during the indictment period? This is all during the indictment period. There were brutally long hours. We introduced time sheets showing that these people never had a day off for years at a time and there was an incident and Judge Donnelly specifically cited this as an example of a worker falling down a flight of stairs from exhaustion. I think the most incendiary piece of evidence in the entire trial was during the indictment period and that was the extortionate contract for Kai Kang that his wife explained how he and his wife were photographed in front of a large stack of cash, more money than they could ever possibly hope to make. They were told that if Kai Kang tried to escape that they would owe that amount to Ryland. In fact, when he did escape, there were efforts made to enter a judgment against Kai Kang. If you have that evidence during the indictment period, then why did you need to introduce evidence about 2001 to 2002, which is eight years before the indictment period? What's the relevance of it? The reason is it's part of one continuous scheme. When you have the escape of Kai Kang in 2010 and then you have the discovery of the documents tracking the various victims, you understand this is all part of a continuous scheme. So when you see Dan Jeong in 2012 receiving an email, a version of one of these contracts with 2002 at a time when he was in charge of the company, you understand this is a continuous scheme and that's the reason why we entered it. Can you address the expert testimony as well? There was testimony that was introduced about China scooping up mentally and physically challenged people, begging in railway stations, taking them out to brick kilns and other dirty establishing what Jeong did during the indictment period. Yes, Your Honor. I think the focus of Ambassador DeVos' testimony was to establish how this particular typology of forced labor scheme worked in the context of a relationship between a large multinational company and the PRC government. So when you're explaining to the contract that it cannot guarantee the personal safety of any of these employees should they attempt to escape from the PRC government, what exactly that means? Certainly, the focus of Ambassador DeVos' testimony was not to suggest that the PRC government is an evil regime and just because Rylan is a Chinese company that therefore Rylan has committed forced labor practices. I think Ambassador DeVos was incredibly careful not to testify as to the final issue here. Would you not come away with a testimony about re-education through labor camps for Uighur Muslims thinking that the regime was engaging in bad conduct? Sure, I would respectfully submit that that was more of a comment. Certainly, if you look at the totality of the testimony, the focus was really on the typologies of forced labor practices and specifically what the interplay would be between the PRC government and PRC construction companies operating abroad. The relevance of the connection to the PRC government is that the workers couldn't be protected from the government and so they'd be subject to that penalty and that's why it's relevant. Is that what you said? Sure, among other reasons, absolutely. And what about commenting on the contract? So when the expert says it raises red flags for him, is that not making a conclusion that the jury should make? I think that's more of a semantics issue. I think he only said red flags one time and he was pointing to specific contractual clauses that while on a superficial reading may appear relatively innocuous upon a closer reading in the context of the relationship between this company and the PRC government are actually more menacing and nefarious and how the workers would have understood those terms. This is a reason why this testimony in Padham was beyond the ken of the average juror. And I guess asking about the question I asked opposing counsel, which is do you defend the district court's decision to sustain the hearsay objection when they were trying to prove Ken Wang's truthfulness? I don't see testimony that is true. Sure. Was that right? Yeah. I think at bottom the testimony was or the testimony sought by the defense would have been cumulative. What Ken Wang testified to during his direct examination was the fact that he was essentially working two jobs at once. And this testimony was corroborated by other witnesses, including defense witnesses who worked under him at U.S. Ryland. And he indicated that this was a fundamentally dishonest act that he did and not telling Ryland that he was working for another at the same time. And, you know, to the extent that these other witnesses who who testified that he was not present in the job. And by the way, Ken Wang was also cross-examined about this dishonest act at length by a defense counsel to the extent the defense sought to introduce reputation evidence. It would have been relatively cumulative. It would just spend these these witnesses who or these employees of U.S. Ryland who didn't see their boss there testifying that he has a reputation for dishonesty because he's not you know, he says he can be one place and he's someplace else. Okay. Thank you very much. If there are no other questions from my colleagues. No, thank you. Thank you, Mr. Solomon. And we'll hear from Ms. Shapiro on rebuttal. Thank you, Your Honor. Just just a few quick points. Taking that last point by my opponent first with respect to Ms. Ken Wang. I mean, the critical testimony that we needed to impeach was this one tiny snippet in which he claimed that Mr. Zhang had told this high-level delegation that there were these repercussions for escaped workers. Now, it was critical to be able to impeach him because with that other evidence and indeed, this and one thing, well, let me just say that he had never said that before. Wang was a an FBI informant for six years and prepared detailed reports for the FBI, multiple detailed reports, and he had never included this alleged statement in his report. And a government that's a government appendix 424 to 425. I now just switching gears. The government, I believe, told your honors. Can I ask so that so so when you're saying, you know, his testimony was important because it connected Zhang to the to the acts in 2001 to 2002. But what about everything the government says about actually Zhang was in a management role in 2001 and 2002. And so he oversaw a lot of those acts, and it's all part of an ongoing conspiracy. And so actually, that one snippet of testimony is not as important as you're suggesting. Well, let me say two things. First of all, I don't mean to suggest that I endorse the government's interpretation of the testimony, because the bigger point that is that if you read the testimony, and it's just one paragraph on appendix 435, there's no evidence of when this conversation occurred. There's no evidence of what worker is related to none of that. It's incredibly vague. So it doesn't even on its face, actually time Mr. Zhang to the earlier period with respect to the claim that Mr. John important role in the early 2000s, there's really nothing to back that up. The the, in fact, the the the workers who testified to the awful events in the early 2000s, two out of the three of them identified Mr. Zhang, and they knew who he was, and not, they not implicate him in the event. But they hadn't only generalized sense of what he did. They didn't say he was the ultimate boss or anything like that. So I think the record doesn't bear it out. And we're talking about, about very old evidence that was just of a different order. If I could just make two other quick points. I also just want to emphasize with respect to the Kai Kang incident, just very court, that the defendant was involved in efforts to quote, abduct Kai Kang, and they point to two pieces of testimony. And one of them, Mr. Ray Tan is asked, Can you tell me about your conversation with the defendant about Kai Kang's escape? This is on a 215. And he says, So it's roughly like this. He asked me if I knew Kai Kang had escaped. I said, I know that he asked me whether there's any likelihood I would know where he is. I said, I don't know. That's it. And then there's one other on a 219. The same witness is, to your knowledge, was anyone in China looking for Kai Kang? And he says, answer Landon Wang. How do you know that answer? Well, if somebody were to look for him, that would be something that Landon Wang was responsible for because he was the project manager. That's it. So there's no connection to the defendant with respect to, nor is there even any evidence that anyone was actually trying to abduct Kai Kang. The last thing, as to the expert, I just want to highlight, without repeating what I said earlier, but this, these workers were not Uyghurs. They were not disabled people. There was absolutely no reason to get into that. And again, if the court really reviews the entirety of the testimony, you will see that it's dominated by this type of improper testimony, as well as things like red flags and troubling when it comes to the contract penalty clauses. And lastly, I did want to mention, as to the expert, that the expert even veers into subjects such as indicating that he believes that people who engaged in forced labor schemes take a pleasure by having this kind of control over other people. All of this is incredibly improper, highly inflammatory, and the government in its summation went back, time and again, back to Mr. DeBaca. The last thing I just want to say is if, and I hope this is not the case, if for any reason your honors are inclined to affirm, I do want to emphasize that we believe that the district court committed procedural error, and I wanted to highlight in particular the error as to the vulnerable victim enhancement, which is supposed to be about targeting victims, and the district court relied primarily on its finding that the conduct made them vulnerable and also failed to make individualized fines. I think we have that argument in the briefs. Thank you very much, Ms. Shapiro. The case is submitted, and because that is the last case on the calendar for today, we are adjourned.